1  Timothy C. Travelstead, Esq. (SBN 215260)
2    *t.travelstead@narayantravelstead.com*
   Scott C. Ku, Esq. (SBN 314970)
3    *s.ku@narayantravelstead.com*
   NARAYAN TRAVELSTEAD P.C.
4  7901 Stoneridge Drive, Suite 230
   Pleasanton, CA 94588
5  Telephone: (650) 403-0150

6
   Attorneys for Plaintiffs
7  HINDU AMERICAN FOUNDATION;
   SAMIR KALRA; MIHIR MEGHANI;
8  SANGEETHA SHANKAR; DILIP AMIN; SUNDAR IYER;
   RAMANA KOMPELLA; AND DOES ONE TO THREE
9

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13  HINDU AMERICAN FOUNDATION, INC., a      Case No. 2-22-CV-01656-DAD-JDP
    Florida Not For Profit Corporation; Samir Kalra
14  Mihir Meghani; Sangeetha Shankar; Dilip
    Amin, Sundar Iyer, Ramana Kompella as       **FIRST AMENDED COMPLAINT FOR:**
15  individuals; and Doe Plaintiffs One to Three

16              Plaintiffs,                      1.  **Civil Rights Violations – Denial of**
                                                     **Religious Freedom – Establishment**
17  vs.                                              **Clause**

18
                                                 2.  **Civil Rights Violations – Denial of**
19  KEVIN KISH, an individual, in his official       **Religious Freedom – Free Exercise**
    capacity as Director of the California Civil     **Clause**
20  Rights Department; and DOES 1 - 50, inclusive,
              Defendants.                        3.  **Civil Rights Violations – Denial of**
21                                                   **Procedural Due Process – Vagueness**

22
                                                 4.  **Civil Rights Violations – Denial of**
23                                                   **Equal Protection – Religion**

24                                               5.  **Civil Rights Violations – Denial of**
                                                     **Equal Protection – National Origin**
25

26

27       The Hindu American Foundation, Inc. (HAF), and Plaintiff Samir Kalra, Plaintiff Mihir

28  Meghani, Plaintiff Sangeetha Shankar, Plaintiff Dilip Amin, Plaintiff Sundar Iyer, Plaintiff

                                        1
                          **FIRST AMENDED COMPLAINT**

Ramana Kompella, Plaintiff Doe One, Plaintiff Doe Two, and Plaintiff Doe Three (the "Individual Plaintiffs") hereby bring this action for declaratory and injunctive relief against Kevin Kish, sued in his official capacity only, the Director of the California Civil Rights Department (CRD) (formerly known as the Department of Fair Employment and Housing) for violating the First Amendment, Equal Protection, and Due Process rights of Hindu Americans.

**INTRODUCTION**

The Hindu American Foundation (HAF), the largest and most respected Hindu educational and advocacy institution in North America, acts to protect the religious freedoms of Hindu Americans from the unconstitutional efforts of the State of California to decide the scope and nature of Hindu religious teachings and practices.  The California Civil Rights Department (CRD) is pursuing enforcement actions under the California Fair Employment and Housing Act (FEHA) that wrongly asserts that a caste system and caste-based discrimination are integral parts of Hindu teachings and practices by declaring the caste system to be "a strict Hindu social and religious hierarchy," having a "centuries-old hierarchy," the doctrine for which mandates "untouchability," by "social custom and legal mandate."  The CRD specified caste as "immutable," and "something which they are born and remain until death," associated with "social exclusion" and "ritual purity".

The CRD also defines the beliefs and practices of Hindus by first attributing caste identity to Indian and/or Hindu workers at Cisco, i.e. "Brahmin" and "Dalit," and then interpreting and assigning religious status of "highest" or "lowest."  The CRD further attributes a caste system to Hinduism by stating that, "John Doe is Dalit because of his religion, …," and that "Doe's religion is Hindu," and further defines Dalits as "at the bottom of the caste hierarchy."

In addition to defining Hinduism as having a strict and discriminatory religious hierarchy, the CRD supports its disfavorable view by submitting declarations, from individuals who are not Hindu, which make numerous false and disparaging statements about Hindus and Hinduism,

including but not limited to, "Caste is a structure of oppression that affects over 1 billion people across the world.  It is a system of religiously codified exclusion that derives from Hindu scripture.  At birth, every child inherits his or her ancestor's caste, which determines social status and assigns spiritual purity and their deeds in past lives"; "Brahmins [Hindu priests], who founded India's caste system, are at the top of the caste system and have benefited from centuries of privilege, access, and power because of it"; "Caste Apartheid is the system of religiously codified exclusion that was established in Hindu scripture. Hindu origin myths state that different people were created from different parts of God Brahma's body and were to be ranked hierarchically according to ritual status, purity, and occupation"; "India's caste system is a complex yet stratified hierarchical order…It emanates from the Hindu alias Brahminical books of rule that have provided certain qualifiers—such as one's ancestry— to ascribe caste status and religion"; and "Religion is another significant factor in deciding one's caste status because it provides the origin of caste values. In India's Hindu-based caste system to which the Complainant belongs, the ancient Hindu texts, especially Vedas, amplify the distinction of humans based on their qualities of hierarchy"; "caste and untouchability are constructions of Hinduism";

The CRD also compares Hinduism disfavorably with Buddhism – "Of the reformers of Brahmanism [Hinduism], Buddhism is seen today as the most promising for a theology of liberation for India."  The CRD also treats Hinduism and Hindus in a manner that it does not treat any other religion or its adherents.

As HAF has consistently maintained throughout its history, a caste system or discrimination on its basis are in no way a legitimate part of Hindu beliefs, teachings, or practices.  The individual plaintiffs who join this action share this belief and feel their religious and cultural identification as Hindu Americans is under threat from the State of California's attempts to illegally disparage their beliefs and background.

HAF and the Individual Plaintiffs vehemently oppose all types of discrimination; and take great exception to the State of California defaming and demeaning all of Hinduism by attempting to conflate a discriminatory caste system with the Hindu religion, and treating it differently than any other religion.

Worse, California defames Hinduism by doing what the U.S. Constitution says it cannot, assert a government right to resolve questions of religious doctrine.  Preventing the government from establishing religious doctrines or interfering with religious practices is as old a principle as the Republic itself.  As American courts have recognized since the earliest days of our Constitution, those principles require a clear and unambiguous prohibition on any "civil determination of religious doctrine." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09, 96 S. Ct. 2372, 2380 (1976).

The wisdom of that principle is reinforced by the complete lack of any objective evidence, law or context in the CRD's assertion.  Caste has no legal, social, or cultural definition in the United States, and is not an observable or objectively determinable trait or characteristic. California law and regulations provide no definition or workable method to determine anyone's caste other than its assumption that Hindus of South Asian, in particular Indian, descent must all necessarily identify as part of a specific caste and must engage in discrimination based on caste as an inherent or mandated part of their religious beliefs and practices.

As a result, the CRD's violation of the First Amendment rights of all Hindu Americans also leads to a violation of their due process rights and would lead employers to actively discriminate against Hindu and South Asian Americans in order to avoid the undefined maze of legal uncertainty that would be California's caste-discrimination bar.  Hindus would effectively lose their due process rights by a state government wrongly labeling part of their religion and ethnic culture as inherently abhorrent, illegal and discriminatory, regardless of the actual tenets of Hinduism and regardless of the evidence or facts of a particular case.

4

**FIRST AMENDED COMPLAINT**

The CRD and the State of California's false and disparaging definition of Hinduism treats it and Hindus in a manner that is unequal and different from the manner in which the CRD treats other religions or their adherents. The CRD also makes false and blanket claims about workers of Indian descent at Cisco, blanketly assigning "high" caste status and claiming that they are all beneficiaries of a Hindu social and religious hierarchy or caste system and have imported the discriminatory system's practices into their team and workplace. The CRD's  false statements about these individuals' religious and caste identity and alleging unlawful conduct simply on the basis of their national origin or ethnicity treats Indians in a manner that is unequal and different from the manner in which the CRD treats other nationalities.  In doing so, the State of California is violating the First Amendment, due process, and equal protection rights of all Hindu and Indian Americans.

Stopping caste-based discrimination is a worthy goal that directly furthers Hinduism's teachings about the equal and divine essence of all people.  But wrongly tying Hindu beliefs and practices to the abhorrent practice of caste-discrimination undermines that goal, violates the First Amendment rights of all Hindu-Americans, and can only lead to a denial of due process and equal protection to Americans based on their religious affiliation and national origin.

### PARTIES

1.      Plaintiff Hindu American Foundation is the largest and most respected Hindu educational and advocacy institution in North America.

2.      Plaintiff Samir Kalra, Esq. is a United States citizen of Indian descent and an attorney and Managing Director at the Hindu American Foundation.  He was born in Santa Clara, California and works and resides in the state.  He is a practicing Hindu and knows that Hinduism promotes the idea that every person has divinity inherent to them and therefore must be treated with equal regard.

3.     In his capacity as Managing Director, Mr. Kalra co-wrote a letter on behalf of Hindu American Foundation to Janette Wipper, then Chief Counsel of the Department of Fair Employment and Housing (CRD), on July 10, 2020, to express his concerns about the blatantly racist and anti-immigrant statements the CRD made about Asians and Indians as well as the false and dangerous stereotypes the CRD had perpetuated in its attempts to define Hinduism in its complaint.  Rather than acknowledge or address their concerns, the CRD repeated the same impermissible and xenophobic claims after refiling its case in state court.

4.     From the time the CRD falsely defined Hinduism as having inherent to it a discriminatory caste system associated with people of Indian descent, Mr. Kalra has spent hundreds of hours, in spite of limited time and resources, responding to media inquiries, including reporters asking intrusive and racist questions about the caste identities and statuses of his and other HAF staff and leaders, and developing educational materials for a variety of stakeholders to defend against the CRD's demeaning portrayal of Hinduism and Hindus.  He has also had to expend time and resources to provide counsel and advice to a number of Hindu tech workers of Indian origin who have reached out to the Foundation about concerns of increased hostility resulting from xenophobic comments and questions by non-Indian origin colleagues or supervisors at their places of work about their religion, caste identities and/or caste practices.  He has had to respond to tech workers of Indian origin dealing with the Diversity, Equity, and Inclusion (DEI) departments at two Fortune 500 companies who have spread damaging misinformation about Hinduism via "training" provided by an outside entity, Equality Labs, that the CRD extensively relied upon when bringing its claims against Cisco.  HAF and Mr. Kalra never had such inquiries prior to July 2020.

5.     The CRD supports its disfavorable view of Hinduism and Hindus through its submissions, and reliance and collaboration with Equality Labs.  In addition to disparaging statements made about Hinduism in Equality Labs' founder's declaration and the Equality Labs

6
**FIRST AMENDED COMPLAINT**

report extensively cited and submitted by the CRD, Equality Labs has also stated in its publicly available trainings, speaking engagements, and resources that: "[Hinduism is] filled with violent, violent scriptures;" or "Every act of Hindu scripture has done nothing but bring violence and pain;" or "The Nazis aren't Germans in f***king Europe, they're actually upper caste Indians."

6.      The CRD was made aware of Equality Labs' past anti-Hindu activities in the letter Mr. Kalra wrote on July 10, 2020. It stated, "In addition, this group, Equality Labs, has a long track record of engaging in anti-Hindu hate through its attacks on Hindu festivals, demeaning Hindu practices and beliefs, calling for the destruction of Hinduism, and heckling Hindu children testifying about their experiences being bullied in the classroom at the State Board of Education."

7.      The resulting toll from the CRD's conduct has been both financial and operational for HAF, and it has taken a deep psychological and spiritual toll on Mr. Kalra, and all of the Individual Plaintiffs.  The CRD's conduct has made it clear that the CRD views Hindus, and even non-Hindu Indian Americans, "like second-class citizens" and that "their participation in the political community will be chilled" by the State of California labeling them as inherently discriminatory and caste-ist, in direct contradiction to Hinduism's actual teaching.  *Catholic League for Religious & Civ. Rights v. City & County of San Francisco,* 624 F.3d 1043, 1049 (9th Cir. 2009).  Mr. Kalra and all of the Individual Plaintiffs suffered the "spiritual or psychological harm" sufficient to establish standing here.  *Id.* at 1050.

8.      Plaintiff Dr. Mihir Meghani is a US citizen of Indian descent and works as an Emergency Room physician in the State of California.  He was born in Philadelphia, Pennsylvania and moved to the State of California in 2000.  He co-founded the Hindu American Foundation and is an active member of various Hindu American and Indian American religious, cultural and civil organizations based in California.  Dr. Meghani identifies as a practicing Hindu and believes that Hinduism teaches that not only all people, but all living things must be treated

with mutual respect and dignity.  He also believes that the conflation of caste and caste discrimination with Hinduism contradicts Hindu teachings and his beliefs as a Hindu.

9.      A physician colleague questioned Dr. Meghani in front of a group of coworkers about his "terrible caste system" after reading about CRD's case against Cisco.  Another colleague of Dr. Meghani concluded that caste discrimination was central to Hinduism after reading about the CRD's case and its position.  Several interfaith leaders and elected officials, with whom Dr. Meghani has worked with for almost two decades, asked him to clarify whether he and Hindus in America believed in and practiced discrimination.  Dr. Meghani finds it unbelievable that in 2023, in a state where Hindu Americans are contributing so positively to every sector in the state, that the CRD could disparage his ethnic community and show such disfavor towards his religion.  The CRD's position has resulted in professional and social stigma and animosity, and personal anxiety about his reputation as a Hindu in the workplace and in his civic engagement work.

10.      Plaintiff Sangeetha Shankar is a United States citizen of Indian origin and works as the California based regional director for the Hindu American Foundation.  She has resided in the State of California since 2014 and identifies as a devout Hindu.  She is an active member of her religious community and has volunteered in a number of capacities, including teaching religion, classical Indian dance, and Sanskrit.  She understands her faith to teach that all are equal, which is the lens through which she views the world and how she interacts with it.  As a Hindu, she strongly believes that there is indwelling divinity in each living being and hence treats others with respect and love.

11.      The CRD's case against Cisco has become a central topic of discussion at social and religious events, which has adversely impacted Mrs. Shankar's ability to feel she can practice her religion without fear or inhibition.  She feels she has to constantly explain herself and cannot just be left to celebrate her faith and identity.  She and her children have been asked

uncomfortable questions in the past about their faith, and such questions have only increased after the CRD's disparaging definition of Hinduism.  The CRD's claims about Hinduism, Hindus and Indians has caused her immense mental health issues ranging from anger, anxiety, sleeplessness and incessant worrying, especially as a mother.  Mrs. Shankar does not feel the same openness about being Hindu anymore.  She feels fear, anxiety and even angered that she feels the need to hide her true identity and her faith as a Hindu American.

12.     Plaintiff Dilip Amin is a United States citizen of Indian origin and has lived in the State of California since 2011.  He identifies as a devout, practicing Hindu and is actively involved in several religious and cultural Hindu and Indian organizations throughout the San Francisco Bay Area.  He also participates in a number of interfaith activities.  He believes that prejudice or bigotry against anyone contradicts his understanding of Hindu teachings about God's presence in all of existence.  He believes this teaching imposes a duty on everyone to treat people for their inherent and equal worth.

13.     Dr. Amin learned about the CRD's case against Cisco in an interfaith email group he was a member of.  He states that he felt depressed for several days after reading about it and didn't know how or where to start in defending his faith.  As a founder of the Hindu Speakers Bureau, Dr. Amin speaks at different venues and events about Hinduism.  While he would feel some nervousness about getting a question about common stereotypes about India and Hinduism, he now has serious anxiety because a state agency like the CRD, which is tasked with ensuring that everyone is treated fairly and equally, has broadly portrayed Hinduism as mandating discriminatory practices as a matter of religious belief.  The public speaking that he used to enjoy has become a demoralizing and painful experience psychologically and spiritually over the last two years because of the volumes of media coverage the CRD generated over its case.

14.     He fears that his adult sons could become the target of the CRD, much in the way the two Indian origin engineers at Cisco Systems did, and a caste assigned to them because of

their Indian and Hindu heritage.  He also worries about his future grandchildren and great-grandchildren, who may feel the need to turn their backs on their heritage because of shame or disgust.  He worries that they too could also be presumed as being casteists because of their Indian ancestry because the CRD claims they are active participants of an oppressive religious and cultural system because they are of Indian descent and Hindu.

15.     Plaintiff Sundar Iyer is a United States citizen of Indian origin and resident of the State of California.  He does not believe or practice any organized religion and does not identify with any caste.  He believes in treating everyone fairly and on the basis of their humanity with respect and equal regard, and has publicly decried all forms of discrimination.  Mr. Iyer maintained a publicly-available personal website[1] for over two decades where his lack of any practice in organized religion was clearly discussed.  Iyer writes, "The below is not about religion (I don't profess knowledge of, and have never practiced any."  During the course of the CRD's investigation, it uncovered clear evidence that Mr. Iyer had worked to promote self-identified Dalit employees at Cisco to positions of leadership, including positions where those Dalit employees would supervise other Indian employees who self-identified as being from backgrounds different than these employees.

16.     Despite this public information, and despite Mr. Iyer specifically informing the CRD of these facts before it initiated any litigation, the CRD nonetheless filed suit against Mr. Iyer claiming that he was a practicing Hindu of the 'Brahmin' caste, one of the 'highest' castes in India, and that he discriminated against other Cisco employees who identified as 'Dalit', a 'lower' caste.  CRD named Mr. Iyer as a defendant, alleging that he engaged in religious discrimination against a self-identified Dalit Cisco employee based on the false allegation that Mr. Iyer, as a Hindu of the Brahmin caste, necessarily followed "a strict Hindu social and religious hierarchy" based on caste.  The CRD filed this action despite being made aware that

---

[1] http://yuba.stanford.edu/~sundaes/serious.html

Mr. Iyer was irreligious or an agnostic and did not identify with any caste, and in fact, publicly rejected such social identities.

17.     Ramana Kompella is a United States citizen of Indian origin and resident of the State of California.  He identifies as Hindu and rejects the idea of caste hierarchies.  Over the entirety of his career, he has worked with different races, ethnicities, religions, and cultures and has neither condoned or participated in any type of discrimination.  He believes in embracing diversity and has done so for over 20 years.

18.     The CRD claimed that Mr. Kompella engaged in caste-based harassment because he required weekly status reports from CRD's Plaintiff, John Doe, because of Doe's 'Dalit' caste.  However, Mr. Kompella did not assign these reports.  Mr. Tom Edsall, who is not of Indian origin or Hindu, assigned them.

19.     The CRD nonetheless filed suit against Mr. Kompella claiming that he was a Hindu 'Brahmin' or "at least of a higher caste than Dalit", and therefore discriminated against another Cisco employee who identified as 'Dalit'.  The CRD named Mr. Kompella as a defendant, alleging that he engaged in religious discrimination against this self-identified Dalit Cisco employee based on the presumption that he, as a Hindu of the Brahmin caste, necessarily followed "a strict Hindu social and religious hierarchy" or discriminatory caste system.

20.     As a result of the CRD's unconstitutional attack on Mr. Iyer and Mr. Kompella based on their presumed adherence to Hindu beliefs and practices, presumed ancestry or self-identity as being of the "highest" Hindu Brahmin caste, and Indian national origin, they have suffered significant harm.  Mr. Iyer no longer works for Cisco Systems, his reputation is now forever associated with a religious tradition he does not follow based on assertions about that religion which are false, and he is forever associated with the CRD's false accusation that he engaged in caste discrimination, conduct which he abhors based on his own beliefs and past public statements.  Mr. Kompella continues to work for Cisco Systems, but his reputation is now

forever associated with the CRD's false accusation that he engaged in caste discrimination, conduct which he too abhors based on his own beliefs, and a religion the CRD disfavors and has deemed inherently discriminatory on the basis of caste.

21.     Doe Plaintiff One is of South Asian descent, is a practicing Hindu working in the technology sector, and resides in California.  She understands that caste discrimination has no place in Hindu teachings and did not experience anyone talking about caste or making any decisions based on caste until after the California Civil Rights Department brought its actions against Cisco Systems.  The CRD's attempts to define Hindu beliefs as including caste falsely identifies her as someone who practices caste discrimination as a religious belief, causing significant emotional and spiritual anxiety and insecurity.  She finds it frustrating that even when she has repeatedly explained to others that Hinduism and caste are not the same and that Hinduism expressly rejects caste as a belief.

22.     Doe Plaintiff Two is of South Asian descent, is a practicing Hindu working in the technology sector, and resides in California.  The CRD's actions have led to significant animosity directed at himself and other employees of South Asian descent, again based on the false representations by the CRD's actions against Cisco Systems leading people to believe that Hindus are inherently discriminatory.  As a result, he feels significant mental and spiritual turmoil, and the express hatred he has received on internal company social media channels makes him fear for his safety.

23.     Doe Plaintiff Three is of South Asian descent, is Hindu, works in the technology sector, and resides in California.  In response to the CRD's actions, his employer and fellow employees have been addressing questions about caste and issues that never arose before, and he has felt significant animosity directed at him based on the CRD's legally-endorsed false presumption that he is a Hindu practicing caste-based discrimination as a part of his religious beliefs.  At work, he has been ostracized by those who simply feel that they should stay away

from anyone who looks like they are South Asian and/or practice Hindu because they do not understand the difference and do not want to risk getting accused of harassment or discrimination.  As a result of these false representations, he feels significant mental and spiritual turmoil, and the express hatred he has received on internal company communication channels based on the false narrative creates significant mental, emotional, and spiritual anxiety.

24.     Defendant Kevin Kish, sued in his official capacity only, is the Director of the California Civil Rights Department.[2]  In his official capacity, Mr. Kish is charged with enforcing California's civil rights, employment and housing laws.  The main office of the California Civil Rights Department is located in Elk Grove, California, within the Eastern District of California.

## JURISDICTION

25.     Plaintiffs bring this action under 42 U.S.C. Section 1983, which provides that "[e]very person who, under color of any statute . . . of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  Therefore, this Court has jurisdiction over this matter under 28 U.S.C. Section 1331.

### HAF Organizational Standing

26.     The judicial power of the United States is limited to cases or controversies.  (U.S. Const. Art. III.).  "To state a case or controversy under Article III, a plaintiff must establish standing." *Arizona Christian School Tuition Organization v. Winn*, 563 U. S. 125, 133 (2011).  Plaintiffs have standing to invoke the judicial power of the United States where they demonstrate they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of

---

[2] Formerly known as the California Department of Fair Employment and Housing (DFEH).

13

**FIRST AMENDED COMPLAINT**

the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U. S. 330, 338 (2016).

27.     Where the plaintiff is an organization, Article III's standing requirements are satisfied either where the organization itself suffered an injury or, alternatively, where it represents the injuries suffered by its members. *Warth v. Seldin*, 422 U. S. 490, 511 (1975). "The latter approach is known as representational or organizational standing." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, ___U.S.___ ; 143 S.Ct. 2141, 2157, 216 L.Ed.2d 857, 875-876 (2023).  "To invoke it, an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id*.; *quoting Hunt v. Wash. State Apple Adver. Comm'n*, 432 U. S. 333, 343 (1977).

28.     Technical membership structures are not required.  "Rather, an organization satisfies the Hunt requirements for associational standing where 'the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Students for Fair Admissions, supra*; *citing Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (quoting *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003)).

29.     Where the plaintiff organization clearly represents a defined interest of its voluntary membership, "[t]he indicia of membership analysis employed in *Hunt* has no applicability." *Students for Fair Admissions*, *supra*, 143 S.Ct. at 2158, 216 L.Ed.2d at 876. "Where, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Id*.

### *HAF Mission*

30.     The Hindu American Foundation is an educational and advocacy organization established in 2003.  Its mission focuses on advancing the understanding of Hinduism to secure the rights and dignity of Hindu Americans now and for generations to come.  It works with state boards of education and publishers to ensure Hinduism is portrayed accurately and fairly in public school textbooks.

31.     It educates policymakers and channels the concerns of the community on key issues such as non-discrimination, free speech, religious freedom, amongst others.  And it pursues impact litigation and participates as *amicus curiae* when the civil rights of Hindu Americans are at risk.

32.     Inspired by our guiding principles and Hindu teachings, HAF promotes dignity, freedom, equality and justice.  HAF is a non-partisan, non-profit, tax-exempt public charity pursuant to Internal Revenue Code Section 501(c)3.

### *HAF Presence in California*

33.      HAF has a significant presence in the State of California, both the organization itself and the constituency it represents.  Three of its seven current board members, one of whom is a cofounder, reside and/or work in the State of California.  It has four paid staff members that also work and reside in California.

34.     HAF's Ten-Person National Leadership Council is a diverse group of core volunteers who collectively serve as a sounding board.  They lend their respective professional and personal expertise, contribute to HAF's development needs and assist in select programs, services and projects.  Three members of the National Leadership Council reside and/or work in California.

35.     HAF also has an Advisory Committee, a diverse group of recognized community leaders, to provide strategic guidance, to offer their personal and professional expertise, and to

contribute to HAF's development needs.  Four of the seventeen Advisory Committee members reside and/or work in the State of California.

### *Representation of the Hindu Community in California*

36.     In Fiscal Year 2022-2023, 815 people residing and/or working in California donated to HAF.

37.     HAF provides action alert broadcasts on VoterVoice, an advocacy platform that connects advocates to lawmakers to advocate on issues impacting Hindu Americans.  5,000 people, the overwhelming majority of whom identify as Hindu, reside and/or work in California and subscribe to the alert broadcasts.

38.     As part of its educational and advocacy mission, HAF works with scholars or scholar-practitioners of Hinduism and Hindu spiritual leaders for their expertise in Hinduism.  At least half a dozen of those scholars and scholar-practitioners reside and/or work in California.

39.     HAF also represents the interests of people of Indian and South Asian descent who, while not Hindu, suffer from discrimination and prejudice based on the assumption that they are Hindu and based on the very type of hurtful and harmful misrepresentations promulgated by the CRD that are the central issue of this litigation.

40.     The Individual Plaintiffs are all California-based supporters, members, or constituents of the Hindu American Foundation.  They have all suffered concrete injury, including Sundar Iyer and Ramana Kompella, individual defendants named by the CRD in the Cisco matter based on its hurtful, harmful and impermissible misrepresentations about Hinduism. Each has an injury traceable to the conduct of the CRD falsely claiming that Hinduism is an inherently discriminatory religion.  And that injury is likely to be redressed by the injunctive relief sought here.  Each of the Individual Defendants have suffered a deep mental, psychological and spiritual injury based on the CRD's conduct.  The CRD has labeled all Hindus, and all Indian Americans, as adhering to a discriminatory caste system that Hinduism and the

overwhelming majority of Indian Americans reject.  The CRD labels Hindus and Indian Americans, "second-class citizens" and that "their participation in the political community will be chilled" by the State of California labeling them as inherently caste-ist.  *Catholic League for Religious & Civ. Rights v. City & County of San Francisco,* 624 F.3d 1043, 1049 (9th Cir. 2009). The Individual Plaintiffs suffered the "spiritual or psychological harm" sufficient to establish standing here. *Id.* at 1050.

### *HAF Legal Advocacy for the Hindu American Community*

41.     HAF has a long history of defending the rights of Hindu, Indian, and South Asian Americans.  It has twice sued to defend those rights in its own name, with the courts permitting organizational standing in both cases.  *See In re Hindu Am. Found., et al. v. Cal. State Bd. of Educ.*, Case no. 06 CS 00386 (Cal. Super. Ct. 2006) and *Summers, et al v. Adams*, 669 F. Supp. 2d 637 (D.S.C. 2009).  And the courts have welcomed amicus briefs from HAF on dozens of occasions where HAF has defended the religious and national origin rights of Hindu and South Asian, and Indian Americans.

42.     Because each of the Individual Plaintiffs have standing, and because they are all typical members of HAF, HAF has associational/organizational standing to bring this action as well.  The interests HAF seeks to protect are directly germane to its purpose, and neither the claims nor the relief require participation of the individual members.

43.     Therefore, HAF and the Individual Plaintiffs all have standing to bring the claims asserted here.  *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, ___U.S.___ ; 143 S.Ct. 2141, 2157, 216 L.Ed.2d 857, 875-876 (2023).

### *HAF's Predominantly Indian-American Membership*

44.     Because Hinduism originated in India, and because the overwhelming majority of Hindu Americans are of Indian ancestry, HAF's membership, supporters, and constituents are overwhelmingly Indian.

45.     Moreover, because most people assume Indian Americans are practicing Hindus, a substantial part of HAF's mission and work is protecting the Indian American community in America from the same negative and hurtful stereotypes about Hinduism, as even non-Hindus of Indian origin like individual plaintiff Mr. Iyer suffer the same types of discrimination, stigma, and hate.

### HAF Direct Standing

46.     HAF has been directly injured by the CRD's actions here, and therefore has direct standing to bring these claims.  Plaintiffs have standing to invoke the judicial power of the United States directly on their own behalf where they demonstrate they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U. S. 330, 338 (2016).

47.     HAF has suffered an injury because of CRD's wrongfully identifying caste as an inherent part of Hinduism.  HAF has Hindu staff members in California who the CRD has maligned with its defamatory claims.  HAF has extensive Hindu donors and supporters throughout the state, and HAF itself has had to expend considerable time and resources defending the integrity of Hinduism against this unjust and unconstitutional attack by the CRD.

48.     The CRD's decision to falsely label Hinduism as caste-ist as part of its litigation against Cisco directly and negatively affected HAF.  Before the CISCO case, HAF focused on other areas of advocacy, including ensuring Hinduism is properly reflected in California public schools.  After the CRD's actions, HAF faced a barrage of calls and concerns from Hindu Americans living in California because of the false claims about Hinduism, with the concern particularly intense in technology-related workplaces where Hindus and Indians faced hateful reactions from coworkers who now saw them as agents of religiously and culturally mandated discrimination because of the CRD's position.

49.     Because of the nature of the religious rights embodied in the Free Exercise clause, injury in religious freedom cases does not need to involve physical or financial injuries; spiritual and mental suffering that government denial of that religious freedom involves are sufficient to establish standing in such cases. *Catholic League for Religious & Civ. Rights v. City & County of San Francisco*, 624 F.3d 1043 (9th Cir. 2009) (en banc); *Vasquez v. Los Angeles Cnty*, 487 F.3d 1246, 1250 (9th Cir. 2007).

50.     The CRD declares the caste system to be "a strict Hindu social and religious hierarchy," which requires discrimination by "social custom and legal mandate," when, in fact, a caste system or discrimination on its basis are in no way a legitimate part of Hindu beliefs, teachings, or practices.  HAF and Hinduism are vehemently opposed to all types of discrimination.

51.     The CRD is causing the acute mental and spiritual suffering that the First Amendment protects against.  The CRD is knowingly and maliciously misrepresenting Hinduism, labeling Hindus and people of Indian descent throughout California as representing the very discrimination and casteism that they abhor, forcing HAF to fend off an attack on their faith and people from the very state government that is charged with protecting their religious freedoms.

52.     Because of the CRD's false and malicious attack, HAF has suffered concrete injury, caused by the CRD's actions, that can be redressed through injunctive relief ordered by this Court.  HAF, therefore, has direct standing to bring the claims it raises here.

## VENUE

53.     Venue is proper in this judicial district under 28 U.S.C. Section 1391(b)(1), which provides that "[a] civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  Defendant Kevin Kish, sued in his official capacity as the Director of the California Civil Rights

Department, resides in this district and is a resident of the State of California, specifically located in Elk Grove, California, Sacramento County.

## **FACTUAL BACKGROUND**

54.     Established in 2003, the Hindu American Foundation is the nation's largest Hindu education and advocacy organization.  As a non-partisan group that is not affiliated with any other religious or political organization, HAF works with a wide range of people and groups that are committed to promoting dignity, freedom, equality and justice, working across all sampradaya (Hindu religious traditions) regardless of race, color, national origin, citizenship, ancestry, gender, sexual orientation, age and/or disability.

### *Hinduism Teaches the Inherent Equal Worth of All Persons*

55.     As the world's oldest religion with over 1.2 billion adherents, Hinduism represents a broad, pluralistic family of traditions.  Its diversity is bound together by certain ancient, core teachings, not a single spiritual founder, authority or book.

56.     It is the sincerely held belief of the Hindu American Foundation and Hindus they represent that core of Hinduism lies in its assertion that the divine is equally present in all, and that this divinity is the ultimate, eternal, omnipresent reality and reflected through the immortal, individual Self or Pure Consciousness, which takes form through a cycle of birth and rebirth or reincarnation.  This inherent divinity leads Hindus to understand the purpose of human life and means to flourishing as a quest for: (i) goodness or societal well-being (Dharma); (ii) material prosperity and security (Artha); (iii) mental and physical happiness (Kama); and (iv) wholeness or spiritual freedom (Moksha).

57.     Moreover, as a result of this shared divinity, Hinduism asserts a moral obligation (Dharma) to ensure that one's thoughts, words, and actions (Karma) uphold values like truth, non-injury, compassion, equanimity, generosity, and equal regard in order to honor the divine in all.  Developed over millennia through the meditations, experiences, and spiritual practices of its

20

sages, teachers, lay leaders, and practitioners, Hinduism represents a broad and diverse faith, with each of the over 1.2 billion Hindus' understanding its wisdom based on their own study, practice, and experience of its precepts.

58.     The CRD is actively pursuing religious discrimination enforcement actions against Hindu Americans in California State Court based on the inaccurate, colonial assertion that Hindu beliefs and practices include a discriminatory caste system.  In its enforcement action filed in California Superior Court for the County of Santa Clara, Case No. 20CV372366, the CRD alleges that a caste system is "a strict Hindu social and religious hierarchy," which requires discrimination by "social custom and legal mandate" and that Hindu Americans, therefore, adhere to this strict and discriminatory religious hierarchy in violation of the California Fair Employment and Housing Act.  (Exhibit A – CRD/DFEH State Complaint, ¶¶ 1-4.)

59.     The CRD has relied upon individuals who are not Hindu to support and endorse its false, misinformed, and disparaging views about Hinduism and Hindus.  These individuals publicly perpetuate hateful, misinformed and misrepresentative assertions about Hinduism and Hindus and through declarations submitted by the CRD.

60.     The CRD's depiction of the caste system is not based on any universal or widely held understandings among Hindus about their own beliefs and traditions, nor the actual ways in which Indian communities functioned historically or today.

### *The CRD Has No Role in Defining Hinduism*

61.     Regardless of the source of the CRD's misunderstandings about Hindu beliefs and practices, the CRD and the State of California cannot define or act upon assertions of Hindu beliefs and practices that Hinduism itself disclaims.  Just as Catholics are free to define Catholicism and Muslims are free to define Islam, it is for Hindus alone to define Hinduism, and the CRD and the State of California cannot, as it seeks to here, adopt a legal definition of

Hinduism that incorrectly includes caste, a caste system, caste hierarchies, and caste-based discrimination.

62.     The CRD and the State of California are attempting to define Hinduism against the beliefs of an overwhelming number of its own adherents, in direct violation of the constitutional right to religious freedom.  It is attempting to chain Hinduism to discriminatory practices abhorred by and rejected by the vast majority of Hindu Americans and therefore just as much a violation of Hindu American's religious rights as it would violate Christian American's rights if the government declared a belief in slavery as inherently Christian teachings.

63.     The CRD and the State of California have treated Hinduism and Hindus disfavorably and in an unequal manner and different than the manner in which it treats other religions or their adherents.

64.     And in doing so, the State of California is violating the First Amendment's Establishment and Free Exercise clauses as well as the 14th Amendment's equal protection and due process rights of all Hindu Americans.

### *The CRD's Approach Undermines Efforts to End Caste-Based Discrimination*

65.     By wrongly attempting to define Hinduism to include caste, a caste hierarchy and caste discrimination or "untouchability practices" which are socially and legally mandated segregation practices, the CRD would require the very discrimination that it seeks to ban. (Exhibit A – CRD/DFEH State Complaint, ¶¶ 1-4.)

66.     The Religious Freedom Restoration Act prohibits the federal government from taking any action that would "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government can show a compelling government interest in doing so.  42 U.S.C. § 2000bb-1.  Title VII requires an employer to reasonably accommodate the religious beliefs of its employees unless the employer can demonstrate that doing so would impose an undue hardship.  42 U.S.C. § 2000e(j).  The

California Fair Employment and Housing Act, likewise, requires employers to accommodate religious beliefs.  Cal. Gov. Code § 12940(l)(1).

67.   The CRD's enforcement actions assert, as a legally binding principle of law necessary to their religious discrimination claim, that caste discrimination is a religious belief and practice under Hinduism.  Must an employer then accommodate requests for 'untouchability practices" or caste discrimination from employees as a religious accommodation?

68.   California would doubtless answer no, because FEHA states that employers are not required to accommodate religious beliefs "under this subdivision if it would result in a violation of this part or any other law prohibiting discrimination or protecting civil rights."  Cal. Gov. Code § 12940 subd. (l)(3).

69.   But caste discrimination is not barred by any part of any other California law or regulation.  The Fair Employment and Housing Act prohibits discrimination based on: "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status."  Cal. Gov. Code § 12940 subd. (a).  Similar facially neutral and generally applicable categories are listed in California's other civil rights statutes.  See Cal. Gov. Code §§ 11135, 12940; Civ. Code § 51.  Nowhere does Title VII or FEHA, their regulations, or any other provision of federal or California law bar caste discrimination.

70.   In seeking to declare caste an inherent part of Hindu religious beliefs, teachings, and practices, employers might arguably be required to accommodate an employee's request not to work with someone the employee believes to be of the "wrong"or different caste.  An employer might also arguably have to accommodate an employee's request not to be supervised by, or to supervise, persons perceived to be of the "wrong" or different caste, even where no

other employee identifies with that or any caste or has any personal belief in or understanding of a caste system or where other employees lack the ability to recognize or identify different castes.

71.     By wrongly claiming that caste, a caste system and caste-based discrimination are an inherent part of Hindu religious belief and practice, the CRD would actually seem to encourage and possibly even require employers to engage in the very discrimination that they purportedly seek to bar.

72.     The CRD and the State of California's false and disparaging definition of Hinduism treats it and Hindus in a manner that is unequal and different from the manner in which the CRD treats other religions or their adherents.

73.     The CRD's false and blanket claims about workers of Indian descent at Cisco, assigning "high" caste status and claiming that they are all beneficiaries of a Hindu social and religious hierarchy or caste system and have imported the discriminatory system's practices into their team and workplace treats Indians in a manner that is unequal and different from the manner in which the CRD treats other nationalities and ethnicities.

74.     The CRD's false claim that Ramana Kompella required required weekly status reports from CRD's Plaintiff, John Doe, because of Doe's 'Dalit' caste, when in fact the directive came from, Mr. Tom Edsall, a white Caucasian male, treats Mr. Kompella disparately on the basis of his national origin and religion.

75.     In doing so, the State of California is violating the First Amendment, due process, and equal protection rights of all Hindu and Indian Americans.

**FIRST CLAIM FOR RELIEF**
**Civil Rights Violations – Religious Freedom**
**Establishment Clause**

42 U.S.C. § 1983
(HAF and All Individual Plaintiffs)

76.     Plaintiffs incorporate the preceding paragraphs as if they were repeated in full herein.

77.     Plaintiff HAF has standing to bring this claim on behalf of itself and the Hindu Americans it represents.

78.     The Individual Plaintiffs have direct standing to bring these claims based on the harm caused to them by the CRD's actions in violation of their First Amendment rights to religious freedom as guaranteed by the Establishment Clause.

79.     Plaintiffs seek relief under 42 U.S.C. § 1983, which prohibits any person, under color of law, from depriving others of their rights, privileges or immunities secured by the Constitution of the United States.

80.     In filing enforcement actions based on the inaccurate assertion that caste, a caste system and caste-based discrimination are an inherent part of Hindu religious belief and practice, the California Civil Rights Department has acted under color of state law.

81.     Under the First Amendment to the United States Constitution, "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const., 1ˢᵗ Amend.

82.     State actions violate the Establishment Clause when they "'dictate or even to influence such matters [of faith and doctrine],'" *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049 (2020); citing *Hosanna-Tabor*, 565 U. S., at 186 (quoting Kedroff, 344 U. S., at 116).

83.     By acting under color of state law to wrongly define Hindu beliefs, teachings and practices to include an abhorrent practice of discrimination, the California Civil Rights Department has violated the religious freedom rights of Hindu Americans by seeking to legally define their religious beliefs and declaring those inaccurate beliefs and practices as illegal conduct under state law.

84.     By acting under the color of state law to declare that caste discrimination is already barred under the California Fair Employment and Housing Act, and by falsely declaring that caste-discrimination is a fundamental practice of Hinduism, the CRD is declaring Hindus as inherently discriminatory, and subject to state censure, including personal civil actions against them simply because of their status as practicing Hindus.

85.     That this is a real and substantial harm is clear from the fact that the CRD named two individual defendants in the Cisco action based on the CRD's representations that, as Hindus, caste discrimination was inherently part of their religious and cultural beliefs.  The CRD expressly did what the Establishment Clause prohibits, it attempted to define matters of Hindu doctrine and faith against the express teachings of Hinduism.  *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049 (2020); citing *Hosanna-Tabor*, 565 U. S., at 186 (quoting Kedroff, 344 U. S., at 116).

86.     HAF and the Individual Plaintiffs have suffered justiciable injury as a direct result of the CRD's actions, as alleged above.

87.     As a result, Plaintiffs pray for the judgment and relief set forth below.

### SECOND CLAIM FOR RELIEF
**Civil Rights Violations – Religious Freedom**
**Free Exercise Clause**

42 U.S.C. § 1983
(HAF and All Individual Plaintiffs)

88.     Plaintiffs incorporate the preceding paragraphs as if they were repeated in full herein.

89.     Plaintiff HAF has standing to bring this claim on behalf of itself and the Hindu Americans it represents.

90.     The Individual Plaintiffs have direct standing to bring these claims based on the harm caused to them by the CRD's actions in violation of their First Amendment rights to religious freedom as guaranteed by the Free Exercise Clause.

91.     Plaintiffs seek relief under 42 U.S.C. § 1983, which prohibits any person, under color of law, from depriving others of their rights, privileges or immunities secured by the Constitution of the United States.

92.     In filing enforcement actions based on the inaccurate assertion that caste, a caste system and caste-based discrimination are an inherent part of Hindu religious belief and practice, the California Civil Rights Department has acted under color of state law.

93.     Under the First Amendment to the United States Constitution, "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const., 1st Amend.

94.     "To be sure, the Free Exercise Clause bars 'governmental regulation of religious beliefs.'" *Gillette v. United States*, 401 U.S. 437, 462, 91 S. Ct. 828, 842 (1971); *quoting Sherbert v. Verner*, 374 U.S. 398, 402 (1963).  "If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." *Braunfeld v. Brown*, 366 U.S. 599, 607 (1961) (opinion of Warren, C. J.); *quoted in Sherbert, supra*, 374 U.S. at 402.  Neither federal nor state governments can interfere with Americans' free-exercise rights.  *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

95.     Laws violate the Free-Exercise Clause when they "impose special disabilities on the basis of religious status." *Espinoza v. Mont. Dep't of Revenue*, ___U.S.___ [140 S.Ct. 2246, 2254-2255, 207 L.Ed.2d 679, 689-690] (2020); *citing Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S.___ [137 S.Ct. 2012, 2016, 198 L.Ed.2d 551, 555] (2017); *see also Cantwell v. Connecticut*, 310 U. S. 296, 303 (1940).

96.     The CRD has imposed special disabilities on Hindu Americans by acting under color of state law to wrongly define Hindu beliefs, teachings and practices to include an abhorrent practice of discrimination.  The CRD has violated the free exercise rights of Hindu Americans imposing special disabilities based on religion by wrongly claiming that Hindus believe in and participate in a discriminatory caste system and declaring that this abhorrent practice leads them to illegally discriminate on the basis of caste.

97.     By acting under the color of state law to declare that caste discrimination is already barred under the California Fair Employment and Housing Act, and by falsely declaring that caste-discrimination is a fundamental practice of Hinduism, the CRD is declaring Hindus as inherently discriminatory, and subject to state censure, including personal civil actions against them simply because of their status as practicing Hindus.

98.     That this is a real and substantial harm is clear from the fact that the CRD named two individual defendants in the Cisco action based on the CRD's representations that, as Hindus, caste discrimination was inherently part of their religious beliefs and practices.  The CRD expressly did what the Constitution's Equal Protection clause prohibits, it used "religion as a basis of classification for the imposition of duties, penalties, privileges or benefits."  (*McDaniel v. Paty*, 435 U. S. 618, 639, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978) (J. Brennan, opinion concurring in judgment), and did so with the knowledge that at least one of the defendants was "irreligious" or Agnostic, yet portrayed him as Hindu.

99.     HAF and the Individual Plaintiffs have suffered justiciable injury as a direct result of the CRD's actions, as alleged above.

100.     As a result, Plaintiffs pray for the judgment and relief set forth below.

**THIRD CLAIM FOR RELIEF**
**Civil Rights Violations - Denial of Procedural Due Process**
**Vagueness**

42 U.S.C. § 1983
(HAF and All Individual Plaintiffs)

101.    Plaintiffs incorporate the preceding paragraphs as if they were repeated in full herein.

102.    Plaintiff HAF has standing to bring this claim on behalf of itself and the Hindu Americans it represents.

103.    The Individual Plaintiffs have direct standing to bring these claims based on the harm caused to them by the CRD's actions in violation of their Constitutional Right to Due Process.

104.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A statute or regulation violates procedural due-process rights where it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U. S. 285, 304 (2008). A law qualifies as unconstitutionally vague not because it is difficult to prove, but where "it is unclear as to what fact must be proved." *Id.*, at 306.

105.    The CRD's position in wrongly seeking to legally define Hinduism to include belief and practice in caste and a hierarchical caste system is so standardless that it would actually require the very discrimination that it seeks to prevent.

106.    FEHA requires employers to accommodate religious beliefs.  Cal. Gov. Code § 12940 subd. (l)(1).  The CRD wants to establish, as a legally-binding principle of law, that caste discrimination is a religious belief and practice under Hinduism.  The DFEH's position would both require and prohibit use of and consideration of caste beliefs in employment as a religious accommodation to Hindu employees.

107.    This is true despite the language of FEHA that does not require religious accommodation "if it would result in a violation of this part or any other law prohibiting discrimination or protecting civil rights."  Cal. Gov. Code § 12940 subd. (l)(3).

108.    But caste discrimination is not barred by any part of any other California law or regulation.  The FEHA prohibits discrimination based on: "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status."  Cal. Gov. Code § 12940 subd. (a).  Similar facially neutral and generally applicable categories are listed in California's other civil rights statutes.  See Gov. Code §§ 11135, 12940; Civ. Code § 51.  Nowhere does FEHA, its regulations, or any other provision of California law bar caste discrimination.

109.    In seeking to declare caste an inherent part of Hindu beliefs and practices, employers would be required to accommodate an employee's request not to work with someone the employee believes to be of the "wrong" or different caste.  An employer would have to accommodate an employee's request not to be supervised by, or to supervise, persons perceived to be of the "wrong" or different caste, even where no other employee identifies with that or any caste or has any personal belief in a caste system or where other employees lack the ability to recognize or identify different castes.  California would require employers to engage in the very discrimination that it seeks to prevent.

110.    In fact, the only consistent factor the CRD seeks to identify with caste is that it is an inherent part of Hinduism.  That this "authorizes or encourages seriously discriminatory enforcement" against Hindus and Americans of South Asian descent is self-evident.  Without any context outside of its asserted connection to Hinduism, the CRD has provided no meaning or definition of caste and would set up a legal structure that requires the discrimination it seeks to prevent.

111.    By acting under color of state law to enforce a state non-discrimination law in a way that both requires and prevents caste-based discrimination, all based on an inaccurate, colonial view that Hindu religious belief includes a discriminatory caste system, the CRD has violated the procedural due-process rights of all Americans by adopting the interpretation and enforcement of the California Fair Employment and Housing Act that is so standardless that it would authorize or encourage seriously discriminatory enforcement.

112.    As a result, Plaintiffs pray for the judgment and relief set forth below.

### FOURTH CLAIM FOR RELIEF
**Civil Rights Violations – Denial of Equal Protection**
**Religion**

42 U.S.C. § 1983
(HAF and All Individual Plaintiffs)

113.    Plaintiffs incorporate the preceding paragraphs as if they were repeated in full herein.

114.    Plaintiff HAF has standing to bring this claim on behalf of itself and the Hindu Americans it represents.

115.    The Individual Plaintiffs have direct standing to bring these claims based on the harm caused to them by the CRD's actions in violation of their Constitutional Right to Equal Protection.

116.    Under the Fourteenth Amendment to the United States Constitution, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

117.    The "government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits." *McDaniel v. Paty*, 435 U. S. 618, 639, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978) (J. Brennan, opinion concurring in judgment).

118.    Religion is therefore a suspect class under the 14th Amendment's Equal Protection Clause. *Saud v. Days,* 36 F.4th 949, 953 (9th Cir. 2022).  The CRD's actions targeting Hindu Americans and Indian Americans it believes are Hindu are, therefore, subject to strict scrutiny.

119.    By wrongly claiming that Hinduism includes a belief in a discriminatory caste system, by adopting an enforcement position that caste discrimination violates the California Fair Employment and Housing Act, and by filing enforcement actions against some of the Individual Defendant seeking to enshrine its wrong and defamatory view of Hindu beliefs in state law, the CRD as acted under color of state law against Hindu Americans based on religion.

120.    By falsely claiming that Hindu Americans inherently hold discriminatory beliefs in a caste system, and that such beliefs and practices are an inherent and mandated part of the Hindu religion, and by seeking to enforce the California Fair Employment and Housing Act against Hindu Americans based on these false claims, the CRD has applied the Fair Employment and Housing Act in a discriminatory manner against Hindu Americans and fundamentally interfered with Hindu American's religious freedom.

121.    By falsely claiming that Indian Americans, who have expressly informed the CRD that they are not Hindu, are still Hindu and that these non-Hindu Indian Americans therefore engage in caste discrimination as an inherent or mandated part of the Hindu religion, and by seeking to enforce the California Fair Employment and Housing Act against Indian Americans based on these false claims, the CRD has applied the Fair Employment and Housing Act in a discriminatory manner against non-Hindu Indian Americans based on national origin.

122.    The CRD and State of California have already violated the rights of the Hindu Americans that HAF represents when they named two individual defendants in the Cisco action based on the CRD's representations that, as Hindus, caste discrimination was inherently part of their religious beliefs that subjected them to liability under California's Fair Employment and Housing Act.  The CRD expressly did what the Constitution's Equal Protection clause prohibits,

it used "religion as a basis of classification for the imposition of duties, penalties, privileges or benefits." *McDaniel v. Paty*, 435 U. S. 618, 639, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978) (J. Brennan, opinion concurring in judgment).

123.    HAF and the Individual Plaintiffs have suffered justiciable injury as a direct result of the CRD's actions, as alleged above.

124.    As a result, Plaintiffs pray for the judgment and relief set forth below.

**FIFTH CLAIM FOR RELIEF**
**Civil Rights Violations – Denial of Equal Protection**
**National Origin**

42 U.S.C. § 1983
(Plaintiffs Iyer and Kompella)

125.    Plaintiffs incorporate the preceding paragraphs as if they were repeated in full herein.

126.    Plaintiffs Iyer and Kompella have direct standing to bring these claims based on the harm caused to them by the CRD's actions in violation of their Constitutional Right to Equal Protection.

127.    Under the Fourteenth Amendment to the United States Constitution, no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

128.    National origin is a suspect class under the 14th Amendment's Equal Protection Clause.  *Saud v. Days,* 36 F.4th 949, 953 (9th Cir. 2022).

129.    By intentionally and maliciously identifying Plaintiffs Iyer as Hindus, even when the CRD has direct knowledge that they are not, in fact, Hindu, the CRD has acted under the color of state law against Indian Americans based on national origin.

130.    By intentionally and maliciously claiming Plaintiff Kompella took actions against a co-worker, when in fact the CRD knew or should have known that Kompella's non-Indian

33
**FIRST AMENDED COMPLAINT**

supervisor took those actions, the CRD has acted under the color of state law against Indian Americans based on national origin.

131.    By falsely claiming that Indian Americans, who have expressly informed the CRD that they are not Hindu, are still Hindu and that these non-Hindu Indian Americans therefore engage in caste discrimination as an inherent or mandated part of the Hindu religion, and by seeking to enforce the California Fair Employment and Housing Act against Indian Americans based on these false claims, the CRD has applied the Fair Employment and Housing Act in a discriminatory manner against non-Hindu Indian Americans based on national origin.

132.    By falsely claiming that every Indian American supervisor or co-worker at Cisco were "beneficiaries of the caste system" who "imported the discriminatory system's practices into their team and Cisco's workplace," and by seeking to enforce the California Fair Employment and Housing Act against Indian Americans based on these false claims, the CRD has applied the Fair Employment and Housing Act in a discriminatory manner against Hindu and non-Hindu Indian Americans based on national origin.

133.    By falsely claiming Mr. Kompella engaged in caste-based harassment because he required weekly status reports from CRD's Plaintiff, John Doe, because of Doe's 'Dalit' caste, when in fact, Mr. Kompella did not assign these reports, but Mr. Tom Edsall, who is not of Indian origin or Hindu, assigned them, the CRD has applied the Fair Employment and Housing Act in a discriminatory manner against an Indian American based on national origin.

134.    The CRD and State of California have already violated the rights of the Hindu Americans and Indian Americans that HAF represents when they named two individual defendants in the Cisco action based on the CRD's representations that, as Hindus, caste discrimination was inherently part of their religious beliefs and practices that subjected them to liability under California's Fair Employment and Housing Act.  The CRD expressly did what the Constitution's Equal Protection clause prohibits, it used "religion as a basis of classification for

the imposition of duties, penalties, privileges or benefits." *McDaniel v. Paty*, 435 U. S. 618, 639, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978) (J. Brennan, opinion concurring in judgment).

135.     Plaintiffs Iyer and Kompella have suffered justiciable injury as a direct result of the CRD's actions, as alleged above.

136.     As a result, Plaintiffs pray for the judgment and relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment that:

1.     Declares that the CRD, through the actions described above, has violated the First Amendment, Due Process, and Equal Protection rights of Hindu Americans.

2.     Declares that the CRD, through the actions described above, has violated the First Amendment, Due Process, and Equal Protection rights of Hindu Americans.

3.     Enjoins the CRD from engaging in any act or practice that seeks to define Hinduism as including a caste system or any other belief or practice.

4.     Enjoins the CRD from bringing any religious discrimination action based on the premise that Hindu belief and practice includes a caste system.

5.     Enjoins the CRD from ascribing religious or moral beliefs or practices to persons or groups who expressly disclaim any such beliefs or practices.

6.     Enjoins the CRD from ascribing caste-ist beliefs or practices to persons of Indian or Indian Americans based on their national origin.

7.     Enjoins the CRD from ascribing religious beliefs to Indian or Indian Americans based on their national origin.

8.     Awards attorneys' fees and costs incurred for the prosecution of this matter as provided by law.

9.     Grants such other additional relief as the Court deems just and proper.

Dated: September 21, 2023                    NARAYAN TRAVELSTEAD P.C.

                                             /s/ Timothy C. Travelstead
                                             Timothy C. Travelstead, Esq.
                                             Scott C. Ku, Esq.
                                             Attorneys for Plaintiffs
                                             HINDU AMERICAN FOUNDATION;
                                             SAMIR KALRA; MIHIR MEGHANI;
                                             SANGEETHA SHANKAR; DILIP AMIN;
                                             SUNDAR IYER; RAMANA KOMPELLA; AND
                                             DOES ONE TO THREE

EXHIBIT A

E-FILED
10/16/2020 12:16 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV372366
Reviewed By: D Harris

1  JANETTE WIPPER (#275264)
   MELANIE L. PROCTOR (#228971)
2  SIRITHON THANASOMBAT (#270201)
   JEANETTE HAWN (#307235)
3  CALIFORNIA DEPARTMENT OF FAIR
     EMPLOYMENT AND HOUSING
4  2218 Kausen Drive, Suite 100
   Elk Grove, CA  95758
5  Telephone:  (916) 478-7251
   Facsimile:   (888) 382-5293
6

7  Attorneys for Plaintiff,
   California Department of Fair Employment and Housing          (Fee Exempt, Gov. Code, § 6103)

8

9            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10           IN AND FOR THE COUNTY OF SANTA CLARA

11 CALIFORNIA DEPARTMENT OF FAIR            Case No.  20CV372366
   EMPLOYMENT AND HOUSING, an agency of
12 the State of California,                 CIVIL RIGHTS - EMPLOYMENT
                                            DISCRIMINATION
13                            Plaintiff,
                                            DEMAND FOR JURY TRIAL
14          vs.

15 CISCO SYSTEMS, INC., a California
   Corporation; SUNDAR IYER, an individual;
16 RAMANA KOMPELLA, an individual,

17                            Defendants.

18

19

20         The California Department of Fair Employment and Housing (DFEH) brings this action against

21 Cisco Systems, Inc. (Cisco) to remedy workplace discrimination, harassment, and retaliation violations

22 at its San Jose, California corporate headquarters under the California Fair Employment and Housing

23 Act, Cal. Gov't Code § 12900, *et seq.* (FEHA). Specifically, Cisco engaged in unlawful employment

24 practices on the bases of religion, ancestry, national origin/ethnicity, and race/color against

25 Complainant John Doe,[1] and after Doe opposed such unlawful practices, Cisco retaliated against him.

26 ──────────────────────

27 [1] Because of the stigma and potential threats of violence associated with a person's status as Dalit,
   DFEH uses a fictitious name for Complainant to protect his privacy and protect him from further
   discrimination, harassment, or retaliation based on his caste and related characteristics. Through the
28 DFEH's administrative process, Defendants have been made aware of Doe's legal name.

Cisco also failed to take all reasonable steps to prevent such unlawful practices in its workplace, as required under FEHA.

## INTRODUCTION

1.      John Doe is Dalit Indian, a population once known as the "Untouchables," who are the most disadvantaged people under India's centuries-old caste system.[2] As a strict Hindu social and religious hierarchy, India's caste system defines a person's status based on their religion, ancestry, national origin/ethnicity, and race/color—or the caste into which they are born—and will remain until death.[3] At the bottom of the Indian hierarchy is the Dalit, typically the darkest complexion caste, who were traditionally subject to "untouchability" practices which segregated them by social custom and legal mandate. Although *de jure* segregation ended in India, lower caste persons like Dalits continue to face *de facto* segregation and discrimination in all spheres.[4] Not only do Dalits endure the most severe inequality and unfair treatment in both the public and private sectors, they are often targets of hate violence and torture. Of India's approximately 1.3 billion people, about 200 million are Dalits.[5]

2.      Unlike Doe, most Indian immigrants in the United States are from upper castes. For example, in 2003, only 1.5 percent of Indian immigrants in the United States were Dalits or members of lower castes.[6] More than 90 percent were from high or dominant castes. Similarly, upon information and belief, the same is true of the Indian employees in Cisco's workforce in San Jose, California.

---

[2] Complainant John Doe is Dalit because of his religion, ancestry, national origin/ethnicity, and race/color. The caste to which someone belongs is immutable and determines their social status in traditional Indian culture. Social stratification and discrimination based on caste persists in India and among those living outside India, including in America. Encyclopedia Britannica, *India: Caste* (June 24, 2020), https://www.britannica.com/place/India/Caste (last visited June 29, 2020).

[3] Smita Narula, Human Rights Watch, *Caste Discrimination: A Global Concern,* Background: "Untouchability" and Segregation (2001), https://www.hrw.org/reports/2001/globalcaste/caste0801-03.htm#P133_16342 (last visited June 29, 2020).

[4] Human Rights Watch & Center for Human Rights and Global Justice at New York University School of Law, *Hidden Apartheid: Caste Discrimination against India's "Untouchables,"* at 45 (2007), https://www.hrw.org/reports/2007/india0207/india0207webwcover.pdf.

[5] Office of the Registrar General & Census Commissioner, India, Ministry of Home Affairs, Government of India, *2011 Primary Census Abstract*, https://censusindia.gov.in/pca/default.aspx.

[6] Tinku Ray, *The US isn't safe from the trauma of caste bias*, The World (Mar. 08, 2019, 9:00 AM), https://www.pri.org/stories/2019-03-08/us-isn-t-safe-trauma-caste-bias.

3.      As alleged below, at Cisco's San Jose headquarters, Doe worked with a team of entirely Indian employees. The team members grew-up in India and immigrated as adults to the United States. Except for Doe, the entire team are also from the high castes in India. As beneficiaries of the caste system, Doe's higher caste supervisors and co-workers imported the discriminatory system's practices into their team and Cisco's workplace.

4.      Doe's supervisors and co-workers, Defendants Sundar Iyer and Ramana Kompella, are from India's highest castes. Because both knew Doe is Dalit, they had certain expectations for him at Cisco. Doe was expected to accept a caste hierarchy within the workplace where Doe held the lowest status within the team and, as a result, received less pay, fewer opportunities, and other inferior terms and conditions of employment because of his religion, ancestry, national origin/ethnicity, and race/color. They also expected him to endure a hostile work environment. When Doe unexpectedly opposed the unlawful practices, contrary to the traditional order between the Dalit and higher castes, Defendants retaliated against him. Worse yet, Cisco failed to even acknowledge the unlawful nature of the conduct, nor did it take any steps necessary to prevent such discrimination, harassment, and retaliation from continuing in its workplace.

5.      Not only did Cisco disregard Doe, but also its own workforce. For decades, similar to Doe's team, Cisco's technical workforce has been—and continues to be—predominantly South Asian Indian. According to the 2017 EEO-1 Establishment Report (EEO-1 Report), for example, Cisco has a significant overrepresentation of Asian employees compared to other companies in the communications, equipment and manufacturing industry (NAICS 3342) in the same geographic area, which is statistically significant at nearly 30 standard deviations.[7] Such overrepresentation is also present in management and professional job categories. In addition to Cisco's direct workforce, Cisco also employs a significant

---

[7] 2017 EEO-1 Report for Cisco Systems, Inc. at 170 West Tasman Drive in San Jose, California. Because Cisco is a federal contractor and employs 50 or more employees in California and the United States, Cisco is required to file an Employer Information Report EEO-1, also known as the EEO-1 Report. The EEO-1 Report requires employers to report employment data for all employees categorized by sex, race/ethnicity, and job category. EEOC, *EEO-1 Instruction Booklet*, https://www.eeoc.gov/employers/eeo-1-survey/eeo-1-instruction-booklet (last visited June 23, 2020).

number of South Asian Indian workers through Indian-owned consulting firms.[8] When combining its direct employees and consultants together, Cisco is among the top five H-1B visa users in the United States.[9] Over 70 percent of these H1-B workers come from India.[10] Outside of San Jose, Cisco's second largest workforce is in India.

6.      Although Cisco has employed a predominantly South Asian Indian workforce for decades, Cisco was—and continues to be—wholly unprepared to prevent, remedy, or deter the unlawful conduct against Doe or similarly situated lower caste workers. Cisco failed to take any steps whatsoever to prevent ". . . inequalities associated with [c]aste status, ritual purity, and social exclusion [from] becom[ing] embedded . . ." into its workplace, which is a documented problem for ". . . American mainstream institutions that have significant South Asian immigrant populations."[11] A 2018 survey of South Asians in the U.S. found that 67% of Dalits reported being treated unfairly at their American workplaces because of their caste and related characteristics.[12] However, few South Asian employees raised concerns to their American employers, because they believe "their concerns will not be given weight" or will lead to "negative consequences to their career."[13] This is precisely what happened to Doe at Cisco.

---

[8] Joshua Brustein, *Cisco, Google benefit from Indian firms' use of H-1B program*, The Economic Times (June 6, 2017, 8:31 PM), https://economictimes.indiatimes.com/tech/ites/cisco-google-benefit-from-indian-firms-use-of-h-1b-program/articleshow/59020625.cms.
[9] Laura D. Francis & Jasmine Ye Han, *Deloitte Top Participant in H-1B Foreign Worker Program—By Far*, Bloomberg Law (Feb. 4, 2020, 2:30 AM), https://news.bloomberglaw.com/daily-labor-report/deloitte-top-participant-in-h-1b-foreign-worker-program-by-far.
[10] U.S. Citizenship and Immigration Services, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2019 Annual Report to Congress October 1, 2018 – September 30, 2019*, at 7 (Mar. 5, 2020), https://www.uscis.gov/sites/default/files/reports-studies/Characteristics_of_Specialty_Occupation_Workers_H-1B_Fiscal_Year_2019.pdf
[11] Maari Zwick-Maitreyi et al., Equality Labs, *Caste in the United States: A Survey of Caste Among South Asian Americans*, 16 (2018) https://static1.squarespace.com/static/58347d04bebafbb1e66df84c/t/5d9b4f9afbaef569c0a5c132/1570459664518/Caste_report_2018.pdf.
[12] *Id.* at 20.
[13] *Ibid.*

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

1

## JURISDICTION AND VENUE

2      8.      This action is authorized and instituted pursuant to California Government Code sections

3 12930 (f) and (h), and 12965(a).

4      9.      The employment practices alleged to be unlawful were and are now being committed

5 within the County of Santa Clara in the State of California, which is within the jurisdiction of the

6 Superior Court of the County of Santa Clara. (Cal. Gov't Code § 12965, subd. (a).)

7      10.     Plaintiff has standing to bring this suit and has complied with all statutory prerequisites to

8 maintain FEHA claims.

9      11.     John Doe filed a pre-complaint inquiry with DFEH on or about April 20, 2018, and a

10 verified administrative complaint against Defendant Cisco on or about July 30, 2018. The charge was

11 dually filed with the Equal Employment Opportunity Commission (EEOC). DFEH properly served the

12 administrative complaint on Defendant Cisco on or about August 7, 2018. On or around October 9,

13 2018, Doe filed an amended administrative complaint against Defendants Cisco, Iyer, and Kompella.

14 The amended administrative complaint was properly served on all named responding parties on or about

15 October 9, 2018.

16     12.     DFEH investigated Doe's dually filed EEOC-DFEH charge and complaint pursuant to

17 California Government Code sections 12930(f) and 12963.

18     13.     Pursuant to Cal. Gov't Code § 12965(a), the DFEH convened a mandatory dispute

19 resolution session on or about February 11, 2020. Settlement discussions were unsuccessful. The DFEH

20 and Defendants entered consecutive tolling agreements to toll the statutory deadline for DFEH to file a

21 civil action to June 30, 2020.

22     14.     On or about June 30, 2020, DFEH filed a civil rights complaint in the United States

23 District Court for the Northern District of California. On or about October 16, 2020, DFEH voluntarily

24 dismissed the federal civil rights action pursuant to Rule 41(a)(1) of the Federal Rules of Civil

25 Procedure.

26     15.     DFEH files this state court action pursuant to the FEHA, California Government Code

27 sections 12930, subdivisions (f)(1), (h), and 12965, subdivision (a), and 28 U.S.C. section 1367,

28

-5-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

subdivision (d). All conditions precedent to the institution of this lawsuit have been fulfilled. The amount of damages sought by this complaint exceeds the minimum jurisdictional limits of this Court.

## **PARTIES**

**Plaintiff California Department of Fair Employment and Housing**

16.     Plaintiff DFEH is the agency of the State of California charged with the administration, interpretation, investigation, and enforcement of the FEHA, and is expressly authorized to bring this action by California Government Code sections 12930, subdivisions (f), (h), and 12965, subdivision (a).

17.     Complainant John Doe is the person claiming to be aggrieved on whose behalf the DFEH files this civil action. (Cal. Gov't Code, §§ 12965, subd. (a), 12930, subd. (f), (h).)

18.     At all relevant times, Complainant Doe was, and remains, an "employee" of Defendant Cisco within the meaning of FEHA. (Cal. Gov't Code, §§ 12926, subd. (c)-(d), 12940, subd. (a), (j), (k).) On or around October 2015 to November 2018, Doe worked as a Principal Engineer with Cisco in Santa Clara County, California. Since on or about December 2018, Doe has worked as a Principal Engineer with Cisco in Santa Clara County, California.

19.     At all relevant times, Complainant Doe was, and remains, a "person" within the meaning of the FEHA. (Cal. Gov't Code, §§ 12925, subd. (d), 12940, subd. (h).)

**Defendant Cisco Systems, Inc.**

20.     Defendant Cisco (EEO-1 reporting number N14137) is a leading global high-tech firm founded in 1984. The company designs, manufactures, sells, and supports equipment for internet-based networking. It has approximately 75,900 employees worldwide and is publicly traded on NASDAQ. The firm's EEO-1 reports places it in the communications equipment manufacturing industry (NAICS 3342). Within California, Cisco employs at least 18,281 employees at 19 establishments in 6 different metropolitan areas, including the corporate headquarters in San Jose.

21.     At all relevant times, Defendant Cisco has continuously been and is now a California Corporation doing business in the State of California and the Cities of San Jose and Milpitas in Santa Clara County and has continuously had at least fifteen employees.

-6-

22.     At all relevant times, Defendant Cisco has continuously been an employer engaged in an industry affecting commerce within the meaning of California Government Code, section 12926, subdivision (d).

23.     At all relevant times, Cisco contracted with and received federal and state funds from the United States and California governments.

**Defendant Sundar Iyer**

24.     At all relevant times, Defendant Sundar Iyer was employed by Cisco as a "supervisor" within the meaning of FEHA. (Cal. Gov't Code, § 12926, subd. (t).) DFEH is informed and believes that Iyer was a Distinguished Engineer with Cisco. Public records indicate Iyer resided in Palo Alto, California at the time of the events alleged herein.

25.     At all relevant times, Defendant Iyer was the agent of Defendant Cisco and was acting within the scope and authority of such agency, and Defendant Iyer is jointly and severally responsible and liable to Complainant Doe for the damages alleged.

**Defendant Ramana Kompella**

26.     At all relevant times, Defendant Ramana Kompella was employed by Cisco as a "supervisor" within the meaning of the FEHA. (Cal. Gov't Code, § 12926, subd. (t).) DFEH is informed and believes that Kompella was a Principal Engineer with Cisco. Public records indicate Kompella resided in Cupertino, California at the time of the events alleged herein.

27.     At all relevant times, Defendant Kompella was the agent of Defendant Cisco and was acting within the scope and authority of such agency, and Defendant Kompella is jointly and severally responsible and liable to Complainant Doe for the damages alleged.

## STATEMENT OF CLAIMS

28.     Beginning in the November 1, 2016, Defendants Cisco, Iyer, and Kompella engaged in unlawful employment practices, in violation of California Government Code, section § 12940 subdivisions (a), (j), (h), and (k). These practices include but are not limited to the practices described below.

29.     Complainant Doe's ancestry, national origin/ethnicity, and race/color is Dalit Indian. Doe has a darker complexion relative to other persons of non-Dalit Indian descent. Doe's religion is Hindu. As a Dalit, he also is known as being from the Untouchable or Scheduled Caste.

30.     Doe has over 20 years of experience in the software development lifecycle process at startups and established companies. In or around September 2015, Iyer recruited and hired Doe as a Principal Engineer for Cisco because of his expertise and experience. As the head of the Cisco team, Iyer hired and supervised Doe, having the authority to control his day-to-day assignments, discipline, discharge, direct, and transfer Doe. Upon information and belief, Iyer is Brahmin.

31.     In or around October 2016, two of Doe's colleagues told Doe that Iyer informed them that Doe was from the "Scheduled Caste" (Dalit) and enrolled in the Indian Institute of Technology (IIT) through affirmative action. Iyer was aware of Doe's caste because they attended IIT at the same time.

32.     In or around November 1, 2016, Doe confronted Iyer about disclosing Doe's caste to other Cisco employees. Iyer asked Doe who claimed he made such a comment. After Doe shared the names of his colleagues, Iyer denied the comment and stated Doe's colleagues were not telling the truth.

33.     In or around November 21, 2016, Doe contacted Cisco's human resources (HR) and Employee Relations to file a discrimination complaint against Iyer.

34.     Six days after Doe's first contact with Cisco's HR and employee relations, Iyer told Doe he was taking away Doe's role as lead on two technologies.

35.     On or around November 28, 2016, Iyer promoted two of Doe's colleagues to head engineering roles, one of whom was Defendant Kompella. Kompella was made Head of Southbound Engineering. Upon information and belief, Kompella is Brahmin or at least of a higher caste than Dalit. With this new title, Defendant Kompella received a raise of approximately 15% or more. As the Head of Southbound Engineering, Kompella had the ability to direct the day-to-day assignments and recommend employment actions for those on his team, including Doe.

36.     On or around November 28, 2016, Iyer also removed team members from the third technology Doe was working on  and did not formally integrate the third technology into either team headed by the two new Heads of Engineering. As a result of these changes, Doe's role was reduced to that of a system  architect as an independent contributor, and he was isolated from all his colleagues.

-8-

37.     On or around December 8, 2016, Doe submitted a written complaint about Iyer's disclosure of Doe's caste, Doe's complaint to Iyer, and Iyer's retaliatory employment actions, including the sudden changes to Doe's job duties. He also complained that Iyer made discriminatory comments to a colleague and about a job applicant because of the applicant's religion (Muslim).

38.     Cisco's Employee Relations Manager, Brenda Davis, conducted the investigation into Doe's December 2016 complaint. Davis' internal investigation notes revealed that Iyer admitted that he told Doe's colleagues that Doe was not on the "main list." Among those from India, it is commonly known that students not on the main list are admitted to IIT through an affirmative action program designed for those from the "Scheduled Castes" or those outside the caste system. Therefore, stating that someone is not on the "main list" effectively reveals their caste. Despite this, Davis took no further action and failed to even contact relevant witnesses or Doe.

39.     Cisco Employee Relations staff, including Davis, also indicated that caste discrimination was not unlawful. As a result, Davis did not recommend any corrective action against Iyer. Iyer also admitted that he made a joke about Doe's co-worker's religion and talked about an applicant's Muslim-related appearance. Still, Davis did not recommend any corrective action. On or around February 2, 2017, Davis closed her investigation finding all of Doe's complaints were unsubstantiated.

40.     Iyer's retaliatory efforts continued. He further isolated Doe from the team when he disparaged Doe to other employees, misrepresented that Doe did not perform his job adequately, and told Doe's team members that they should avoid working with him.

41.     On or around March 2, 2017, Doe sought review of Davis' investigation findings. After repeated attempts to have Cisco review Davis' findings, HR official Tara Powell finally reopened the investigation on or around April 25, 2017. Powell re-interviewed one of the employees to whom Iyer made the comment about Doe's caste in or around October 2015. The employee stated that he learned about Doe's caste but refused to tell Powell how he knew, noting that he did not want to say anything about Iyer because they had known each other for a long time. He also stated that he thought Doe was being treated unfairly and that he was very technically able but was being excluded at work. Powell did not attempt to contact for an interview the other employee who witnessed Iyer's disclosure of Doe's caste. Two additional witnesses told Powell that they feared losing their jobs or otherwise being

-9-

retaliated against for speaking out against Iyer. One of those employees also told Powell that he thought Doe was very competent and asked appropriate questions, but that Iyer was setting Doe up to push him out of the company.

42.     Powell's investigation also uncovered a spreadsheet that showed anticipated yearly raises, bonuses, and restricted stock unit awards that Iyer had promised Doe. These raises, bonuses, and awards never materialized when promised. But Powell also found that four out of the eight other team members received raises in or around October 2016.

43.     In or around August 2017, Powell concluded she could not substantiate any caste-based or related discrimination or retaliation against Doe. Powell, however, determined that Iyer mocked another employee's religion, and thus violated Cisco's Code of Conduct. Still, no immediate corrective action was taken.

44.     Despite Doe's repeated attempts to bring the caste-based and related discrimination, harassment, and retaliation to Defendant Cisco's attention in 2016 and 2017, Cisco failed to recognize casteism as a form of unlawful religion-, ancestry-, national origin/ethnicity-, and race/color-based discrimination or harassment under state or federal law and failed to conduct a thorough investigation. While the investigation confirmed Doe was increasingly isolated and treated unfairly by Iyer and Kompella, Cisco failed to take timely and appropriate corrective action. Moreover, Cisco's training was deficient in that it did not adequately train managerial employees on workplace discrimination, harassment, and retaliation, nor did the company prevent, deter, remedy, or monitor casteism in its workforce.

45.     On or around February 26, 2018, Kompella became the Interim Head of Engineering for Cisco's team after Iyer stepped down. In his new role, Kompella supervised Doe and continued to discriminate, harass, and retaliate against Doe by, for example, giving him assignments that were impossible to complete under the circumstances. Kompella also began requiring Doe to submit weekly status reports to him and Senior Vice President/General Manager Tom Edsall.

46.     On or around May 21, 2018, Rajeev Gupta took over from Kompella and became the Director of Engineering. In that role, Gupta supervised Doe.

-10-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

47.     Two months later, in or around July 2018, Doe applied for the position of Director of Research and Development Operations with Gupta. According to Gupta's interview notes, he ranked Doe as "below average" in six out of eight categories and as "meeting requirements" in the remaining two categories. But Gupta's assessment of Doe was improperly influenced by Iyer's retaliatory employment actions. Gupta specifically cited Doe's lead role being taken away and his job reduced to that of an independent contributor in November 2016. Gupta's notes also reflected Iyer's retaliatory criticisms about Doe's work product, social skills, and insubordination. Doe did not get the position.

48.     The effect of the unlawful employment practices complained of above was to deprive Doe of equal employment opportunities, and otherwise adversely affect his status as employees, because of religion, ancestry, national origin/ethnicity, and race/color.

49.     The unlawful employment practices complained of above were intentional.

50.     The unlawful employment practices complained of above were done with malice or with reckless indifference to Doe's  federally and state-protected civil rights.

## FIRST CAUSE OF ACTION
### Violation of FEHA: Discrimination on the Basis of Religion, Ancestry, National Origin/Ethnicity, and Race/Color
### (Cal. Gov't Code, § 12940, subd. (a))
### Against Defendant Cisco

51.     The DFEH incorporates and realleges all previous allegations as if fully set forth herein.

52.     The FEHA guarantees all employees a workplace free from unlawful discrimination and harassment based on the employee's religion, ancestry, national origin/ethnicity, and race/color. (Cal. Gov't Code, § 12940, subd. (a).)

53.     As alleged above, Cisco discriminated against Doe by subjecting him to disparate terms and conditions of employment based on his religion, ancestry, national origin/ethnicity, and race/color. Among other actions, Cisco reassigned Doe's job duties and isolated him from his colleagues, denied him a raise, denied him work opportunities that would have led to a raise, denied him a promotion to the Head of Engineering, and denied him a promotion to the Director of Research and Development Operations.

54.     Cisco subjected Doe to discriminatory comments and conduct because of his religion, ancestry, national origin/ethnicity, and race/color

-11-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

55. The alleged discriminatory comments and conduct constitute unlawful discrimination for which Defendant Cisco is liable under California Government Code section 12940, subdivision (a).

56. As a direct result of these unlawful employment practices, Doe suffered economic injuries including, but not limited to, lost wages and other compensation, in an amount to be proven at trial.

57. As a direct result of these unlawful employment practices, Doe suffered emotional distress including, but not limited to, emotional pain, suffering, mental anguish, humiliation, and hopelessness, in an amount to be proven at trial.

58. Defendant Cisco's actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Doe and in conscious disregard of his rights.

59. Defendant Cisco engaged in, and by its refusal to comply with the law, demonstrated it will continue to engage in, the unlawful employment discrimination described herein unless it is enjoined pursuant to the FEHA. Unless Defendant Cisco is enjoined from failing or refusing to comply with the mandates of the FEHA, Doe and other persons' rights to seek or hold employment free of unlawful discrimination will continue to be violated.

60. Plaintiff DFEH lacks any plain, speedy, and adequate remedy at law to prevent such harm, injury, and loss that is the subject of this complaint and will continue until this Court enjoins the unlawful conduct and grants other injunctive relief as prayed for herein.

**SECOND CAUSE OF ACTION**
**Violation of FEHA: Harassment on the Basis of Religion, Ancestry, National Origin/Ethnicity, and Race/Color**
**(Cal. Gov't Code, § 12940, subd. (j))**
**Against All Defendants**

61. The DFEH incorporates and realleges all previous allegations as if fully set forth herein.

62. The FEHA prohibits harassment based on the employee's protected characteristics including, but not limited to, their caste, which includes religion, ancestry, national origin/ethnicity, and race/color. (Cal. Gov't Code, § 12940, subd. (j).) Employers are liable for the harassment of their supervisors. (*Id.*, subd. (j)(1).) Employees and supervisors are liable for their own harassing conduct. (*Id.*, subd. (j)(3).)

-12-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

63.     As alleged above, as supervisors for Cisco's team, Defendants Iyer and Kompella subjected Doe to offensive comments and other misconduct based on his caste, which includes his religion, ancestry, national origin/ethnicity, and race/color, so severe or pervasive that it created a hostile work environment. Among other things, Iyer and Kompella's comments and conduct include revealing Doe's caste to his colleagues, disparaging him to the team, isolating him from the rest of the team, reducing his role to that of an independent contributor, giving him assignments that were impossible to complete under the circumstances, and requiring him to submit weekly status reports. Such a work environment where a stigmatizing personal characteristic such as caste is publicized and used to subjugate an individual in order to maintain a centuries-old hierarchy is hostile, intimidating, offensive, oppressive, and abusive. Other employees corroborated that Doe was isolated from the rest of the team and that Iyer and Kompella were responsible for it. These were observations Cisco was made aware of during its internal investigations. As evidenced by Doe's repeated internal complaints, he in fact considered the work environment to be hostile, intimidating, offensive, oppressive, and abusive.

64.     As supervisors for Cisco, Defendants Iyer and Kompella subjected Doe to offensive comments and other misconduct based on his caste, which includes his religion, ancestry, national origin/ethnicity, and race/color, so severe or pervasive that it created a hostile work environment.

65.     Defendants Iyer and Kompella are individually liable for their own harassing conduct in violation of the FEHA.

66.     Because Defendants Iyer and Kompella were supervisors within the meaning of the FEHA, Defendant Cisco is liable for their harassing conduct. Defendant Cisco knew or should have known of the conduct as a result of Doe's internal complaints and is liable for its failure to take immediate and appropriate corrective action.

67.     As a direct result of these unlawful employment practices, Doe suffered economic injuries including, but not limited to, lost wages and other compensation, in an amount to be proven at trial.

68.     As a direct result of these unlawful employment practices, Doe suffered emotional distress including, but not limited to, emotional pain, suffering, mental anguish, humiliation, and hopelessness, in an amount to be proven at trial.

-13-

69.     Defendant Cisco's actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Doe and in conscious disregard of his rights.

70.     Defendant Cisco engaged in, and by its refusal to comply with the law, demonstrated it will continue to engage in, the unlawful employment discrimination described herein unless it is enjoined pursuant to the FEHA. Unless Defendant Cisco is enjoined from failing or refusing to comply with the mandates of the FEHA, Doe and other persons' rights to seek or hold employment free of unlawful discrimination will continue to be violated.

71.     Plaintiff DFEH lacks any plain, speedy, and adequate remedy at law to prevent such harm, injury, and loss that is the subject of this complaint and will continue until this Court enjoins the unlawful conduct and grants other injunctive relief as prayed for herein.

**THIRD CAUSE OF ACTION**
**Violation of FEHA: Retaliation**
**(Cal. Gov't Code, § 12940, subd. (h))**
**Against Defendant Cisco**

72.     The DFEH incorporates and realleges all previous allegations as if fully set forth herein.

73.     California law also guarantees each employees' right to a workplace and business environment free from unlawful retaliation because the employee opposed discriminatory or harassing practices that are unlawful under the FEHA. Employers are liable for the retaliatory conduct of supervisors. (Cal. Gov. Code, § 12940, subd. (h).)

74.     As alleged above, as supervisors for Cisco, Defendants Iyer and Kompella retaliated against Doe for opposing their discriminatory and harassing conduct by confronting Iyer and filing internal discrimination complaints. Among other things, Doe engaged in protected activity by confronting Iyer about disclosing his caste to colleagues and by repeatedly trying to bring the caste-based and related discrimination and harassment to Cisco's attention. Immediately afterwards, Iyer and Kompella subjected Doe to adverse employment actions including reassigning his job duties, isolating him from colleagues, giving him assignments that were impossible to complete under the circumstances, denying him work opportunities that could have led to a raise, denying him a raise, and denying him promotions. Cisco aided the retaliation.

-14-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

75.     As supervisors for Cisco, Defendants Iyer and Kompella retaliated against Doe for opposing their discriminatory and harassing conduct by confronting Iyer and filing internal discrimination complaints and Cisco aided the retaliation.

76.     Defendant Cisco is liable for the retaliatory conduct of Defendants Iyer and Kompella.

77.     As a direct result of these unlawful employment practices, Doe suffered economic injuries including, but not limited to, lost wages and other compensation, in an amount to be proven at trial.

78.     As a direct result of these unlawful employment practices, Doe suffered emotional distress including, but not limited to, emotional pain, suffering, mental anguish, humiliation, and hopelessness, in an amount to be proven at trial.

79.     Defendant Cisco's actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Doe and in conscious disregard of his rights.

80.     Defendant Cisco engaged in, and by its refusal to comply with the law, demonstrated it will continue to engage in, the unlawful employment discrimination described herein unless it is enjoined pursuant to the FEHA. Unless Defendant Cisco is enjoined from failing or refusing to comply with the mandates of the FEHA, Doe and other persons' rights to seek or hold employment free of unlawful discrimination will continue to be violated.

81.     Plaintiff DFEH lacks any plain, speedy, and adequate remedy at law to prevent such harm, injury, and loss that is the subject of this complaint and will continue until this Court enjoins the unlawful conduct and grants other injunctive relief as prayed for herein.

**FOURTH CAUSE OF ACTION**
**Violation of FEHA: Failure to Take All Reasonable Steps to Prevent Discrimination, Harassment, and Retaliation**
**(Cal. Gov't Code, § 12940, subd. (k))**
**Against Defendant Cisco**

82.     The DFEH incorporates and realleges all previous allegations as if fully set forth herein.

83.     California Government Code section 12940(k) provides that it is an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring. Employers have the affirmative duty to take all reasonable steps to prevent and promptly correct discriminatory, harassing, and retaliatory conduct.

-15-

(Cal. Code Regs. tit. 2, § 11023, subd. (a).) Cisco's conduct, as described above, constitutes a failure to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation in violation of California Government Code section 12940, subdivision (k).

84.     An actionable claim for violation of California Government Code section 12940(k) on behalf of a complainant exists when an underlying claim of discrimination, harassment, or retaliation is established. (Cal. Code Regs. tit. 2, § 11023, subd. (a)(2).)

85.     As alleged above, Defendant Cisco failed to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring within its South Asian Indian workforce. Among other things, Defendant Cisco failed to develop anti-discrimination and anti-harassment policies and practices that recognize and prohibit caste discrimination as a form of unlawful discrimination under state and federal law. Defendant Cisco also failed to provide appropriate training to managers, supervisors employees, human resources, and employee relations personnel on how to identify, investigate, remediate, and prevent caste-based discrimination and harassment, or retaliation against employees or persons who oppose discriminatory and harassing practices that are unlawful under the FEHA.

86.     Defendant Cisco failed to prevent discrimination and harassment by its managers and supervisors against Doe because of his caste.

87.     Defendant Cisco failed to prevent retaliation by its managers and supervisors against Doe because he opposed discriminatory and harassing practices that are unlawful under the FEHA.

88.     As a direct result of Cisco's failures, Doe was subjected to unlawful discrimination, harassment, and retaliation by Cisco's managers and supervisors, suffering economic injuries including, but not limited to, lost wages and other compensation, in an amount to be proven at trial.

89.     As a direct result of Cisco's failures, Doe was subjected to unlawful discrimination, harassment, and retaliation by Cisco's managers and supervisors, suffering emotional distress including, but not limited to, emotional pain, suffering, mental anguish, humiliation, and hopelessness, in an amount to be proven at trial.

90.     Defendant Cisco's actions were willful, malicious, fraudulent, and oppressive, and were committed with the wrongful intent to injure Doe and in conscious disregard of his rights.

-16-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

91.     Defendant Cisco engaged in, and by its refusal to comply with the law, demonstrated it will continue to engage in, the unlawful employment discrimination described herein unless it is enjoined pursuant to the FEHA. Unless Defendant Cisco is enjoined from failing or refusing to comply with the mandates of the FEHA, Doe and other persons' rights to seek or hold employment free of unlawful discrimination will continue to be violated.

92.     Plaintiff DFEH lacks any plain, speedy, and adequate remedy at law to prevent such harm, injury, and loss that is the subject of this complaint and will continue until this Court enjoins the unlawful conduct and grants other injunctive relief as prayed for herein.

93.     Plaintiff DFEH also seeks monetary relief for Cisco's failure to take all reasonable steps to prevent harassment from occurring.

**FIFTH CAUSE OF ACTION**
**Violation of FEHA: Failure to Take All Reasonable Steps to Prevent Discrimination, Harassment, and Retaliation**
**(Cal. Gov't Code, § 12940, subd. (k); Cal. Code Regs. tit. 2, § 11023, subd. (a)(3))**
**On behalf of DFEH; Against Defendant Cisco**

94.     The DFEH incorporates and realleges all previous allegations as if fully set forth herein.

95.     In an exercise of the DFEH's police powers, the DFEH may independently seek additional remedies for a violation of Cal. Gov't Code § 12940(k). (Cal. Code Regs. tit. 2, § 11023, subd. (a)(3).) As the agency of the State of California charged with the administration, interpretation, investigation, and enforcement of FEHA, the DFEH brings this claim in the name of the DFEH on behalf of all Indian persons who are or are perceived to be Dalit, of lower castes, or who fall outside the caste system, who are employed by or may seek employment with Cisco in the future.

96.     As alleged above, Defendant Cisco failed to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring within its South Asian Indian workforce. Among other things, Defendant Cisco failed to develop anti-discrimination and anti-harassment policies and practices that recognize and prohibit caste discrimination as a form of unlawful discrimination under state and federal law. Defendant Cisco also failed to provide appropriate training to managers, supervisors employees, human resources, and employee relations personnel on how to identify, investigate, remediate, and prevent caste-based discrimination and harassment, or retaliation against

1  employees or persons who oppose discriminatory and harassing practices that are unlawful under the

2  FEHA.

3       97.     Cisco's failure to take any reasonable steps to prevent, deter, remedy, or monitor casteism

4  and related violations in its workforce exposes a significant portion of its South Asian Indian workforce

5  to the risk of discrimination, harassment, and retaliation on the basis of their caste and related

6  characteristics.

7       98.     Defendant Cisco engaged in, and by its refusal to comply with the law, demonstrated it

8  will continue to engage in, the unlawful employment discrimination described herein unless it is

9  enjoined pursuant to the FEHA. Unless Defendant Cisco is enjoined from failing or refusing to comply

10 with the mandates of the FEHA, Doe and other persons' rights to seek or hold employment free of

11 unlawful discrimination will continue to be violated.

12      99.     Plaintiff DFEH lacks any plain, speedy, and adequate remedy at law to prevent such

13 harm, injury, and loss that is the subject of this complaint and will continue until this Court enjoins the

14 unlawful conduct and grants other injunctive relief as prayed for herein.

15                                **PRAYER FOR RELIEF**

16 WHEREFORE, the DFEH respectfully requests that this Court:

17      1.     Grant a permanent injunction enjoining Defendants, their officers, agents, servants,

18 employees, attorneys, and all persons in active concert or participation with them, from engaging in

19 discrimination and harassment based on religion, ancestry, national origin/ethnicity, and race/color.

20      2.     Grant a permanent injunction enjoining Defendants, their officers, agents, servants,

21 employees, attorneys, and all persons in active concert or participation with them, from engaging in

22 retaliation.

23      3.     Order Defendants to institute and carry out policies, practices, and programs that provide

24 equal employment opportunities for individuals regardless of their religion, ancestry, national

25 origin/ethnicity, and race/color, and that eradicate the effects of their past and present unlawful

26 employment practices

27

28

-18-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination

4.      Order Defendants to make Doe whole, by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other injunctive relief necessary to eradicate the effects of Defendants' unlawful employment practices.

5.      Order Defendants to make Doe whole, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described herein, in amounts to be determined at trial.

6.      Order Defendants to make Doe whole, by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of herein, including losses such as emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

7.      Order Defendants to pay Doe punitive damages for their malicious and/or reckless conduct described herein, in amounts to be determined at trial.

8.      Grant such further relief as the Court deems necessary and proper in the public interest.

9.      Award the DFEH its costs of this action, including reasonable attorneys' fees, as provided by statute.

## JURY TRIAL DEMAND

The DFEH requests a jury trial on all questions of fact raised by its complaint.


Dated: October 16, 2020                CALIFORNIA DEPARTMENT OF FAIR
                                       EMPLOYMENT AND HOUSING


                                       By: _Melanie L. Proctor_____
                                           MELANIE L. PROCTOR
                                           Assistant Chief Counsel
                                           Counsel for Plaintiffs

-19-

*Cal. Dept. Fair Empl. & Hous. v. Cisco Systems, Inc., et al.*
Civil Rights Complaint – Employment Discrimination